**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Kilian Gregoire Hale, | No. CV-20-00558-TUC-JCH |
| Plaintiff, | **ORDER** |
| v. | |
| David Shinn, et al., | |
| Defendants. | |

In this case, incarcerated pro se Plaintiff alleges Defendant Warren failed to treat his migraine headaches and COVID-19 symptoms, and Defendant Ferguson failed to ensure adequately staffed and trained medical services at the Arizona State Prison Complex ("ASPC") Whetstone Unit in Tucson.

Before the Court is Defendants' Motion for Summary Judgment (Doc. 92). The motion is fully briefed. *See* Docs. 98, 105. Plaintiff's evidence does not support his allegations. Instead, the evidence shows that Warren, Ferguson, and other members of ASPC-Tucson's medical staff were consistently responsive to Plaintiff's needs. They prescribed Plaintiff Tylenol and Zyrtec, assigned him to light duty, ordered EKGs and labs, and regularly recorded his symptoms and vital signs. Plaintiff's suit is based entirely on his opinion that he should have received Excedrin and been referred to a specialist. For the reasons below, the Court will grant summary judgment for Defendants.

///

///

## I.      Background

### A. Plaintiff's Complaint and the Court's Screening Order

On July 28, 2021, Plaintiff filed his Second Amended Complaint. Doc. 19. That October, the Court dismissed all claims and defendants except a denial-of-medical-care claim against Defendants Warren and Ferguson. Doc. 21; *see also* Doc. 100 (rejecting Plaintiff's subsequent attempts to pursue other claims). The Court's Order distilled the following allegations connected to Warren and Ferguson:

> On August 26, 2020 [after testing positive for COVID-19], Plaintiff submitted a Health Needs Request (HNR), and was seen for an E.K.G. [Doc. 19 at 6.] Plaintiff was prescribed Tylenol for his headaches, but "never saw the provider, Defendant N.P. Alice Warren." *Id.* On September 3, 2020, Plaintiff was assigned to a "hard labor" job in the kitchen, which made his symptoms worse. *Id.* On September 10, 2020, Plaintiff submitted another HNR, and was told that he would be scheduled to see "the provider" (presumably, Defendant Warren). *Id.* at 7. A nurse told Plaintiff that she would ask Warren to prescribe Excedrin for Plaintiff's headaches in the meantime. Plaintiff never received any Excedrin. *Id.*
>
> On September 12, 2020, Plaintiff submitted an informal complaint resolution, and, on October 6, 2020, he submitted a medical grievance to Defendant Ferguson regarding the lack of any visit with Defendant Warren, the failure to receive the Excedrin, and his "increasing serious COVID-related health problems." *Id.* On October 9, 2020, Plaintiff was seen by Warren. (Doc. 19 at 7.3) Plaintiff told her Tylenol did not work, his symptoms were getting worse, and asked to be referred to a virologist. Warren "dismissed Plaintiff's serious medical needs as being allergies." *Id.* Plaintiff then asked for Excedrin for his headaches, but Warren "suggested that Plaintiff should purchase ibuprofen from the store if the Tylenol did not help." *Id.* Plaintiff told Warren that he was indigent and unable to purchase ibuprofen, and, in any event, that he was not supposed to take ibuprofen "due to kidney problems." *Id.*
>
> Plaintiff then "began another round of HNRs," but the only response he received from Ferguson was to "submit an HNR." *Id.* at 8. After "several months went by without any medical care or treatment," Plaintiff filed several more grievances and HNRs, but was not seen by the provider again or provided any treatment for his symptoms. *Id.* Plaintiff alleges that the only response to his grievances were from Ferguson directing him to "submit an HNR." *Id.*

Doc. 21 at 4–5.

**B. Defendants' Motion for Summary Judgment**

In December 2022, Defendants filed a Motion for Summary Judgment with a separate Statement of Facts. Docs. 92, 93. The Court issued a Notice under *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998), informing Plaintiff of his obligation to respond to the Motion and the requirements for doing so. Doc. 94. The *Rand* Notice warned Plaintiff that "if he 'fail[ed] to controvert the moving party with opposing counter-affidavits or other evidence, the moving party's evidence might be taken as the truth.'" *Id.* at 1. The Notice also warned Plaintiff that if he did "not submit [his] own evidence in opposition, summary judgment … may be entered against [him]." *Id.* at 2. The Notice also warned Plaintiff that Local Rule of Civil Procedure 56.1(b) "requires that you include with your response to the Motion for Summary Judgment a separate statement of facts[.]" *Id.* The Notice further warned that the "separate statement of facts must include numbered paragraphs corresponding to the Defendants' … separate statement of facts." *Id.* The Notice also provided the full text of LRCiv 56.1(b). *Id.*

**C. Plaintiff's Response**

In January 2023, Plaintiff responded to Defendants' summary judgment motion. Doc. 98. Plaintiff did not file a separate statement of facts. *See generally docket*. Instead, Plaintiff created a section of his Response titled "Statement of Facts," in which he provides several unnumbered paragraphs summarizing his case. Doc. 98 at 1–3. Plaintiff's Response also makes various factual assertions and arguments in its main body, citing at times to documents attached as exhibits. *See* Docs. 98, 98-1.

**II.   Legal Standards**

**A.  Summary Judgment**

Summary judgment is appropriate when the parties have no genuine dispute as to any material fact.  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  A dispute is genuine if a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986). A fact is material if it might affect the outcome of the suit. *Id.* The nonmovant must "come

forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1). The court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Liberty Lobby*, 477 U.S. at 255.

### B.  Deliberate Indifference

To state a § 1983 medical indifference claim, a plaintiff must show (1) a "serious medical need" such that failure to treat the condition could result in further significant injury or the unnecessary and wanton infliction of pain, and (2) the defendant's response was deliberately indifferent. *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006). To act with deliberate indifference, a prison official must both know of and disregard an excessive risk to inmate health; "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Deliberate indifference in the medical context may be shown by a purposeful act or failure to respond to a prisoner's pain or possible medical need and harm caused by the indifference. *Jett*, 439 F.3d at 1096.  Deliberate indifference may also be shown when a prison official intentionally denies, delays, or interferes with medical treatment or by the way prison doctors respond to the prisoner's medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976); *Jett*, 439 F.3d at 1096.

"Deliberate indifference is a high legal standard[,]" *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004)—higher than negligence or lack of ordinary due care for the prisoner's safety. *Farmer*, 511 U.S. at 835. "A difference of opinion does not amount to deliberate indifference to [a plaintiff's] serious medical needs." *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). Similarly, a medical decision not to prescribe a given treatment is not deliberate indifference. *Estelle*, 429 U.S. at 107. And a mere delay in medical care, without more, is insufficient to state a claim against prison officials for deliberate indifference. *See Shapley v. Nev. Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985). The indifference must be substantial—it must rise to a level of "unnecessary

1    and wanton infliction of pain." *Estelle*, 429 U.S. at 105. Where medical personnel have
2    been "consistently responsive" to an inmate's medical needs, and there has been no
3    showing of "subjective knowledge and conscious disregard of a substantial risk of serious
4    injury," summary judgment is appropriate. *Toguchi*, 391 F.3d at 1061.

5    **III.    Facts Supported by the Record**

6        The Court will consider all aspects of Plaintiff's Response despite its failure to
7    comply with the local rules governing summary judgment responses. This approach is
8    consistent with the Ninth Circuit approach to pro se prisoners, particularly where they
9    have made at least some effort to comply with the rules. *See, e.g.*, *Rainwater v. Alarcon*,
10   268 F. App'x 531, 534 (9th Cir. 2008); *Davis v. Gardiner*, 205 F.3d 1350 (9th Cir. 1999).
11   Ordinarily, a failure to file an opposing separate statement of facts results in the Court
12   accepting the moving party's facts as undisputed. Here, the Court's *Rand* Notice
13   explained to Plaintiff that a separate statement of facts was required, together with
14   citations to the record. The Notice also explained the consequences of failing to dispute
15   Defendants' facts with record evidence. And Plaintiff could have seen exactly what was
16   required by observing Defendants' Motion for Summary Judgment and concurrently filed
17   Separate Statement of Facts. Despite all this, Plaintiff has not entirely disregarded the
18   rules. His Response includes a "Statement of Facts" section that, although not filed
19   separately, is separated from the rest of the brief. *See* Doc. 98 at 2. And Plaintiff's
20   Response includes citations to attached "Exhibits A–W." Doc. 98-1. Considering
21   Plaintiff's effort and the Court's mandate, the Court will search Plaintiff's Response and
22   Exhibits determine whether a genuine issue of material fact requires trial of his case.

23       But the Court will not accept Plaintiff's allegations and characterizations as true if
24   they lack support in the record. Allegations are taken as true at the motion to dismiss
25   stage—not at summary judgment. At summary judgment, the Court is looking for
26   genuine disputes established by the record to see if a reasonable jury could return a
27   verdict for Plaintiff. The Court will believe Plaintiff's evidence and draw inferences from
28   it in Plaintiff's favor. But that does not require the Court to believe every allegation. *See,*

*e.g.*, *Marks v. United States*, 578 F.2d 261, 263 (9th Cir. 1978) ("Conclusory allegations unsupported by factual data will not create a triable issue of fact.").

The following facts are drawn from Plaintiff's evidence, or from Plaintiff's administrative record and Arizona Department of Corrections, Rehabilitation, and Reentry ("ADCRR") policy documents provided by Defendants.

### i.   ADCRR Policies Governing Inmate Health Services

The ADCRR Health Services Technical Manual governs routine healthcare service requests by inmates. Doc. 93-5 at 2–4. Inmates may make a non-emergency health appointment by submitting a Health Needs Request ("HNR"). Doc. 93-5 at 3 ¶¶ 1.1, 1.2. HNRs are triaged by nursing staff, who determine whether an HNR requires an appointment in the "nursing line" or the "provider line." Doc. 93-5 at 4 ¶ 3.0. The nursing line is for "routine services such as … vital sign checks" as well as follow-ups ordered by providers. Doc. 93-9 at 4 ¶ 3.2. The nursing line may also refer inmates to the "provider line." Doc. 93-9 at 4. ¶ 3.4. The "provider line" is not clearly defined by the ADCRR policy documents, but both parties refer to it as providing more expansive care than the nursing line. *See, e.g.*, Doc. 93 at 3–4; Doc. 98 at 8. Warren is a nurse practitioner serving on the provider line. *See, e.g.*, Doc. 93 at 3–4; Doc. 98 at 8.

ADCRR Department Order 802 governs inmate medical grievance procedures. Doc. 93-2 at 2–7. An inmate challenging an aspect of confinement must first file an "Informal Complaint Resolution" form. Doc. 93-2 at 4 ¶ 2.1. Informal Complaints are addressed by the Contract Facility Director of Nursing. Doc. 93-2 at 5 ¶ 2.3.3.1. If the Nursing Director's response does not resolve an inmate's complaint, the inmate may file a medical "Formal Grievance." Doc. 93-2 at 6 ¶ 5.1. Formal Grievances are investigated and addressed by the Contract Facility Health Administrator. *Id.* Ferguson was the ASPC-Tucson Facility Health Administrator until September 4, 2021. Doc. 93-1 at 2 ¶ 1.

### ii.   July 2020

Several health issues predate Plaintiff's July 2020 transfer to the Whetstone Unit. On various dates before transferring Plaintiff was assessed with a pinched low back

nerve, cystic kidney disease, schizophrenia, antisocial personality disorder, low back pain, "other diseases of stomach and duodenum," anxiety disorder, major depressive disorder, and "other somatoform disorders." *See* Doc. 93-10 at 128–130. Shortly before transferring, Plaintiff was also assessed with a "productive cough and wheezing" (April 16, 2020) and "nasal congestion" (May 5, 2020). Doc. 93-10 at 129. When he transferred, Plaintiff had prescriptions for Wellbutrin, commonly used as an antidepressant, and Claritin, commonly used to treat allergies. *Id.*

### iii.   August 2020

On August 4, 2020, Plaintiff tested positive for COVID-19. Doc. 93-10 at 56. On August 17, 2020, after a 14-day quarantine, Plaintiff was discharged as non-symptomatic "COVID recovered." *See* Doc. 93-10 at 53.

On August 27, 2020, Plaintiff submitted two nearly identical HNRs. Doc. 98-1 at 8–9. The HNRs alleged "constant head-aches for the past 3 weeks," "sharp pains around my heart," congestion, lost sense of smell and taste, light-headedness, and dizziness. *Id.* The next day, Plaintiff submitted another HNR alleging "constant dull pain" in his chest, feelings of being "about to have a heart attack," "sick, nauseated, numb in [his] left hand, a continual headache, sore throat, coughing," light-headedness, and dizziness. Doc. 98-1 at 10. Plaintiff's HNRs were signed by "F Holmes RN" on August 28, 2020. Doc. 98-1 at 8–9. They include a "Plan of Action" that states, "Seen on [nursing line,] Cetirizine [generic for Zyrtec] and acetaminophen [generic for Tylenol] ordered." *Id.* A third HNR from August 27 is marked "Duplicate HNR" and signed by a different, unidentified staff member with the "Plan of Action" left blank. Doc. 98-1 at 10.

On August 28, 2020, Plaintiff's medical record shows he was seen in the nursing line by "F[a]y Holmes," a registered nurse. Doc. 93-10 at 105–110. The medical record of Plaintiff's visit provides Plaintiff's subjective symptoms, capturing the issues identified in Plaintiff's HNRs. *Id.* at 105–106. The record characterizes Plaintiff's chest pain as "now 1/10" and "at worst: 5/10." Doc. 93-10 at 105. The medical record also provides objective symptoms determined by Nurse Holmes or staff: clear lungs, regular pulse, warm and dry

skin, and a non-tender abdomen. *Id.* at 106. The medical record shows an EKG was ordered. *Id.*; *see also* Doc. 93-10 at 19 (EKG results). Plaintiff's EKG is marked "Normal." Doc. 93-10 at 19. The record concludes with a "Nursing Diagnosis" of "Chest Pain [and] Allergies/headache." Doc. 93-10 at 107.

Aspects of Plaintiff's August 28 nursing-line visit and his EKG are attributed to Defendant "A. Warren Nurse Practitioner." Doc. 93-10 at 19, 108–110. Defendant Warren signed Plaintiff's EKG and authorized a Zyrtec and 30-day Tylenol prescription. Doc. 93-10 at 19, 108–110. Under a medical record section titled "Ordered Drug Prescriptions," the Zyrtec prescription status reads "Order Accepted at Pharmacy," and the Tylenol prescription status reads "Received from Pharmacy." Doc. 93-10 at 108. The Zyrtec prescription expires November 20, 2020, and the Tylenol prescription expires September 26, 2020. *Id.*

### iv.   September 2020

On September 8, 2020,[1] Plaintiff submitted a new HNR. Doc. 98-1 at 11. The HNR alleged that Plaintiff was "still experiencing chest pains, sore throat, fatigued, coughing, loss of smell and taste, nausea, congestion, runny nose and other symptoms that are not going away after being sick from the COVID-19 virus." *Id.* The HNR also alleges that Plaintiff is "still getting headaches [despite] the Tylenol medical gave me." *Id.* The HNR is again signed by "F. Holmes, RN," and states "Seen on [nursing line,] EKG normal." *Id.* Plaintiff's EKG is again marked "Normal," and signed by Defendant "A. Warren Nurse Practitioner." Doc. 93-10 at 18.

The September 8 medical record notes that Plaintiff "complains of intermittent chest pain [but] denies pain at this time." Doc. 93-10 at 181. The record notes Plaintiff's chest pain as "now 1/10" and "at worst: 4/10." Doc. 93-10 at 180. The record further notes that Plaintiff was "recently prescribed [Zyrtec] but … states he never got it. Medication refilled." *Id.*; *see also* Doc. 93-10 at 28 (issuing Zyrtec). The medical record also provides the results of an objective examination: clear lungs, regular pulse, warm

---

[1] The HNR is dated "9/10/2020," but the staff treatment date is marked "Sep. 8, 2020."

and dry skin, and a non-tender abdomen. *Id.* at 106. The record concludes with a "Nursing Diagnosis" of "Allergic rhinitis [allergies]." Doc. 93-10 at 182. Plaintiff's "Prescription Orders" include Zyrtec expiring "11/25/2020," and Tylenol expiring "9/26/2020," and are marked "Received from Pharmacy." Doc. 93-10 at 183.

On September 12, 2020, Plaintiff filed an "Informal Complaint Resolution." Doc. 98-1 at 12. In the Informal Complaint, Plaintiff alleges the symptoms outlined in his HNRs. *See id.* Plaintiff disputes his diagnosis of anxiety and allergies. *Id.* He explains that "anxiety is not the problem" because it never included chest pain in the past, and because the chest pains occur even when Plaintiff is relaxed. *Id.* He further explains that he has "never had allergies in [his] life." *Id.* Plaintiff concludes that he needs to see "the doctor here instead of the nursing staff because there has to be some kind of health problem related to these chest pains." *Id.*

On September 29, 2020, the "[Director of Nursing] Padovano" responded to Plaintiff's Informal Complaint. Doc. 98-1 at 13. Reviewing Plaintiff's medical record, the Director noted that Plaintiff was scheduled to meet a provider on October 9, 2020, and concluded that Plaintiff's Informal Complaint was thus resolved. *Id.*

### v.   October 2020

On October 6, 2020, three days before his scheduled provider appointment, Plaintiff filed a Formal Grievance. Doc. 98-1 at 14. The Grievance alleged that although "the 'Response' [to Plaintiff's Informal Complaint] states that I am scheduled to see the doctor, [the issue] is not resolved until I do." *Id.* Plaintiff alleged "ever increasing headaches, chest pains and now pressure in [his] eyes effecting [his] vision." *Id.* He also alleged "non stop migraine headaches to the point that I am developing some type of foggy brain syndrome, and unable to think clearly." *Id.* Plaintiff concludes, "I need to see a doctor to figure out what is happening." *Id.*

On October 9, 2020, Plaintiff appeared on the provider line for his scheduled appointment. Doc. 93-10 at 49–52. Warren treated Plaintiff. *Id.* at 49. Warren recorded Plaintiff's subjective symptoms, including "intermittent chest pain 2x weekly – starts after

working in kitchen – which causes back pain – then leads to headache – then leads to chest pain." *Id.* Warren noted Plaintiff "denies fever/chills, [shortness of breath]/cough, chest pain/palpitations." *Id.* Warren also noted Plaintiff "believes chest pain is caused initially from back pain – also caused from stress and anxiety." *Id.* Warren also noted "chronic intermittent … low back pain since 2013 – caused from injury – currently taking Tylenol." *Id.* Warren reviewed Plaintiff's September 8 EKG and an MRI of his spine. *Id.* She conducted a physical exam, recording "afebrile, … no cough, … no heart murmur, … mild tenderness in the lumbosacral spine area." *Id.* Finally, Defendant Warren ordered a lab diagnostic panel, issued a "Special Needs Order" assigning Plaintiff to light work duty for one year, and recorded "Plan Notes" including "cont[inue] Tylenol, [Special Needs Order] … HNR as needed." *Id.* at 51.

On October 27, 2020, Ferguson responded to Plaintiff's Grievance, in which he alleged the need to see a provider. Doc. 98-1 at 15. Ferguson noted Plaintiff's October 9 visit with Warren and concluded Plaintiff's issue had been addressed. *Id.* This was Ferguson's only interaction with Plaintiff on the evidence before the Court.

### vi.   December 2020

On December 1, 2020, Plaintiff submitted another HNR. Doc. 98-1 at 16. He alleged "constant migraine headaches, trouble thinking and concentrating, breathing problems and chest pains ever since contracting the COVID-19 virus." *Id.* Plaintiff acknowledged that his sense of taste and smell had returned, but that "all other symptoms remain." *Id.* Plaintiff requested "to see the doctor (not the nurse) as soon as possible." *Id.* Plaintiff's HNR is signed by "K. William, RN," and the "Plan of Action" section states "Seen on [nursing line]." *Id.* The HNR does not mention Warren. *Id.*

A December 2, 2020 medical record indicates Plaintiff was seen on the nursing line. Doc. 93-10 at 172–176. The record of his visit notes subjective symptoms of headache pain at "now 5/10" and "at worst: 9/10." *Id.* at 172. Plaintiff stated that he was taking Tylenol but "sometimes it does not help." *Id.* at 173. The medical visit record notes that Plaintiff had a "headache 5/10" and "denie[s] having [chest pain,] no signs of

acute distress[, and] refused to see mental health to help with concentration." *Id.* The record provides "Plan Notes" instructing Plaintiff to "drink plenty of fluids (water)[, and] continue Tylenol for pain management." *Id.* at 175. The record also provides in "Headache – Plan/Intervention" that "No referral to Provider Necessary," and "[over-the-counter] medication per site guideline. List: acetaminophen, ibuprofen, Excedrin[.]" *Id.* The medical visit record does not mention Warren. *Id.*

On December 28, 2020, Plaintiff filed his original complaint, which did not name Ferguson or Warren as defendants. Doc. 1 at 1. Plaintiff alleged, among other things, that he was suffering "constant migraine headaches, difficulty to think or concentrate, trouble breathing normally, irregular heartbeat and constant chest pains, and very alarming." Doc. 1 at 10. Plaintiff further alleged "Medical is claiming these are allergy symptoms, but have never suffered from allergies, and only issue Tylenol." *Id.* The Court dismissed Plaintiff's complaint for failure to file on a court-approved form but granted leave to refile and provided a form. Doc. 5.

### vii.   February 2021

On February 11, 2021, Plaintiff's "Electronic Documents/Images" history has an entry marked "COVID TEST RESULTS." Doc. 93-10 at 222.

On February 25, 2021, Plaintiff submitted another HNR. Doc. 98-1 at 17. Plaintiff realleged "loss of taste and smell" despite having allegedly regained it in December, as well as "trouble breathing, chest pains, fatigue, constant headaches, irregular body temperature, loss of memory, trouble thinking and concentrating, rashes, trouble sleeping, body numbness, [and] loss of voice." *Id.* The HNR was signed by "C. Franco LPN," is marked "[nursing line]," and reports "last covid test was negative 12/30/20." *Id.* An associated medical record characterizes the "Inmate Health Issue" as "concerned about lingering covid." Doc. 93-10 at 30. The HNR is signed by staff "U. Mullaney LPN" and provides a "Plan of Action" of "Provider review." Doc. 93-10 at 5 (providing a more legible copy of Doc. 98-1 at 18). The HNR does not mention Warren. *Id.*

///

viii.  **March 2021**

On March 7, 2021, Plaintiff submitted another HNR. Doc. 98-1 at 18. He alleged "difficulty breathing, easily winded, constant headaches and chest pains, trouble sleeping, trouble thinking and concentrating, memory problems, loss of taste and smell, and easily fatigued." *Id.* He referred to the February HNR and stated he needs "to see a doctor about my health." *Id.* The HNR does not mention Warren. *Id.*

A March 7, 2021 medical record indicates Plaintiff was seen on the nursing line. Doc. 93-10 at 82–87. The record of his visit notes subjective symptoms of "[shortness of breath], headache, trouble sleeping." *Id.* at 82. In the record's "Objective Notes" section, it states that Plaintiff's headache pain was "5/10 aching," but "chest pain no longer present." *Id* at 83. It further states that Plaintiff had clear lungs, regular cardiac rhythm, "EKG completed, reading, 'normal sinus rhythm." *Id.* The record further sates "[EKG] emailed to … provider Warren for interpretation." *Id.* The EKG reads "Normal" but does not have Warren's signature. Doc. 93-10 at 15. The medical visit reports that "[Plaintiff] states home medication available for pain." Doc. 93-10 at 85. Finally, Plaintiff was advised "to report to medical" with any further issues. *Id.* at 86.

On March 25, 2021, Plaintiff's "Electronic Documents/Images" history has an entry marked "COVID-19 IMMUNIZATION CONSENT." Doc. 93-10 at 221.

On March 29, 2021, Plaintiff filed his second Informal Complaint. Doc. 98-1 at 19. He alleged long-term COVID issues including "fatigue, memory and thought problems, motor skill problems, insomnia, constant headaches and body numbness, chest pains, difficulty breathing, coughing, always feeling sick." *Id.* He further alleged that "other than chest pains, these other medical problems are not addressed. I keep putting in HNRs thinking I'm going to see the doctor/provider but it's always the nurses line, and can't even get Tylenol anymore." *Id.* Plaintiff requested to "see an outside doctor cause medically the doctor here is not addressing these health problems, and believe that there is serious medical problems taking place." *Id.* Plaintiff concluded by highlighting the possibility of "organ damage, brain damage, [or] internal infection," and emphasizing the

"need to see a real doctor." *Id.* The Informal Complaint does not mention Warren. *Id.*

### ix.   April 2021

On April 7, 2021, Plaintiff submitted an HNR for back pain and requested Gabapentin. Doc. 93-10 at 4. He alleged that he was losing sleep and in pain due to bulging discs and a pinched ulna nerve, and that "Tylenol and Ibuprofen is not helping." *Id.* Plaintiff was referred to the provider line on April 9, 2021, by "A. Salgado RN." *Id.* The HNR does not mention Warren. *Id.*

An April 14, 2021 medical record indicates Warren examined Plaintiff regarding his April 7 HNR. Doc. 93-10 at 42–46. Defendant Warren reviewed an MRI of Plaintiff's spine and an October 9, 2020 provider note reporting Plaintiff's "intermittent dull/aching/sharp low back pain since 2013 – caused from injury – currently taking Tylenol." *Id.* at 42. Warren noted no cardiorespiratory symptoms. *Id.* Warren also recorded that Plaintiff "declines physical therapy or antidepressant for pain – taking Tylenol" and Plaintiff "became agitated and walked out of provider visit." *Id.* Warren's "Plan Notes" report "chronic pain – [continue] meds … HNR as needed." *Id.* at 44.

On April 16, 2021, Nursing Director Danielle Dennis responded to Plaintiff's second Informal Complaint. Doc. 98-1 at 20. Director Dennis stated that she reviewed Plaintiff's chart, noting that he "submitted two HNRs related to [concerns about lingering COVID symptoms] and [was] seen once by a registered nurse." *Id.* The Director continued that "[c]onsults to outside medical providers are generated by our providers when necessary. If your concerns have not been addressed please submit another HNR with your specific complaint[.]" *Id.*

On April 17, 2021, Plaintiff signed two HNRs subsequently marked "cancelled per inmate request." *Compare* Doc. 98-1 at 21, *with* Doc. 93-10 at 2–3. In one Plaintiff alleged "difficulty breathing and gasping for air, severe memory problems, body numbness, constant headaches, irregular body movements and motor skill problems, vision problems, trouble urinating, [and] chest pains." Doc. 98-1 at 21, Doc 93-10 at 2. The HNR requested a specialist. *Id.* In the other HNR, Plaintiff alleged "sharp nerve pain

1   in my left arm (due to a pinched ulna nerve), and this pain is constant, as is the pain in my

2   back from bulging discs." Doc. 93-10 at 3. The second HNR requested "a different doctor

3   because the one I just saw will not do anything." *Id.* Both HNRs were "cancelled per

4   inmate request" and signed "A Warren." Doc. 93-10 at 2–3.

5          On April 20, 2021, Plaintiff's "Electronic Documents/Images" history has an entry

6   marked "REFUSAL TO CONTINUE ECOUNTER." Doc. 93-10 at 221. On April 21,

7   2021, there is an entry marked "Refusal to continue encounter." *Id.* On April 23, 2021,

8   there is an entry marked "COVID-19 IMMUNIZATION CONSENT." *Id.*

9          On April 24, 2021, Plaintiff signed a second Inmate Grievance. Doc. 98-1 at 22.

10  Plaintiff repeated his allegations of severe long-term COVID symptoms, a "pattern of

11  ignoring and denying medical treatment" and the need to see a specialist. *Id.* The

12  "Received By" section of Plaintiff's second Grievance is faintly marked "Brice," Title

13  "CoII," Badge Number "10459," and dated "4 24 21." *Id.* Unlike Plaintiff's first

14  Grievance, the second Grievance is not signed or dated by a Grievance Coordinator, and

15  the sections at the bottom titled "Staff Member's Signature," "Badge Number," and

16  "Date" are also blank. *Compare* Doc. 98-1 at 22, *with* Doc. 98-1 at 14. Plaintiff's second

17  Grievance also does not appear in Defendants' record evidence. *Id.*; *see* Docs. 93-1

18  through -10. Plaintiff alleges the April 24 Inmate Grievance was never responded to.

19  Doc. 98 at 13. The Court is obliged to draw all inferences in Plaintiff's favor but cannot

20  infer the Grievance was filed because it lacks a grievance coordinator signature and a

21  staff member signature like Plaintiff's first Grievance. Although the "Received By"

22  section gives some indication that Plaintiff's form was received by "Brice," that is not a

23  party to Plaintiff's suit and Plaintiff provides no explanation for the discrepancy.

24          **x.   May 2021 (First Amended Complaint)**

25          On May 11, 2021, Plaintiff filed his Amended Complaint. Doc. 13. The Amended

26  Complaint named Ferguson as a defendant but not Warren. *Id.* at 2. The Court dismissed

27  the Amended Complaint for failure to state a claim. Doc. 16. The submitted record does

28  not include further HNRs, Informal Complaints, or Formal Grievances submitted

1  between May 11, 2021, and Plaintiff's Second Amended Complaint. *See generally* Docs.

2  93-1 through -10, 98-1. Plaintiff's "Electronic Documents/Images" history has no HNR

3  entries between April 30, 2021, and March 22, 2022. Doc. 93-10 at 221.

4         **xi.   July 2021 (Second Amended Complaint)**

5         On July 28, 2021, Plaintiff filed his Second Amended Complaint. Doc. 19. The

6  Second Amended Complaint names Warren and Ferguson as defendants. *Id.* at 2.

7  Plaintiff's Response attaches several records created after his Second Amended

8  Complaint. *See* Doc. 98-1 at 23–31. Records created after July 28, 2021, cannot support a

9  claim for medical indifference arising before July 28, 2021.[2]

10  **IV.   Analysis**

11        Summary judgment is appropriate here because Defendants were consistently

12  responsive to Plaintiff's medical needs. Plaintiff fails to provide evidence to support his

13  claims or to call into question his consistently normal medical exams. Plaintiff claims that

14  Defendants were deliberately indifferent to his requests for Excedrin and his lingering

15  COVID-19 symptoms. But the record shows Plaintiff was promptly and appropriately

16  examined after submitting HNRs and had access to Tylenol and Zyrtec for his symptoms.

17  There is no record of a specific request for Excedrin, and no evidence suggesting that

18  Tylenol and Zyrtec were inappropriate. Plaintiff's record also belies Plaintiff's allegations,

19  showing consistently mild or absent symptoms despite HNRs alleging increasingly

20  debilitating symptoms.

21        **A.  Defendant Warren**

22        Summary judgment is warranted for Warren. The record shows only limited

23  connection to Warren, and none of it permits an inference of negligence, much less

24  deliberate indifference. Warren was primarily involved with Plaintiff at two points: a Fall

25  _____

26  [2] For the record, the Court has reviewed Exhibits Q–W and finds they would not change
the Court's analysis in any event. In the exhibits, Plaintiff continues to allege the need to
27  see a doctor and, in two HNRs from 2022, that he needed his Excedrin prescriptions
refilled. One of the exhibits is a Grievance Response explaining that Plaintiff was seen,
28  given pain relievers, and Zyrtec and an inhaler. These exhibits do not mention
Defendants or support Plaintiff's claims against Defendants.

2020 exam concerning Plaintiff's COVID symptoms, and a Spring 2021 exam concerning Plaintiff's back pain. At the Fall 2020 exam, the evidence shows Warren reviewed Plaintiff's EKGs, authorized a Tylenol and Zyrtec prescription for him, examined him, and ordered labs and light duty work. At the Spring 2021 exam, the evidence shows Warren reviewed Plaintiff's medical record and his request for Gabapentin rather than Tylenol or Ibuprofen, conducted a physical exam, and confirmed he had Tylenol. In the Spring 2021 exam, Warren also noted Plaintiff declined physical therapy and an antidepressant that also helps with pain, and that Plaintiff became agitated and walked out of the appointment. Referring both to these specific interactions and generally to his interactions with all ASPC-Tucson medical staff, Plaintiff repeatedly asserts that his care was inadequate but never explains what in the record supports his claims against Warren.

### i.   Fall 2020 Interactions Regarding COVID-19 Symptoms

Plaintiff raises several objections to Warren's Fall 2020 treatment of his COVID-19 symptoms. First, Plaintiff asserts that during his October visit with Warren, Warren dismissed him "without any physical examination, nor any assessment." Doc. 98 at 9. He further alleges that Warren told him he was "just trying to get out of working in the kitchen." *Id.* But the medical record of Plaintiff's October visit shows he was examined and assigned to light duty for a year. Plaintiff never addresses that fact. He does not, for example, allege that the medical records are inaccurate, or engage with the notes in them. Without evidence supporting Plaintiff's claim that Warren did not examine him, and with evidence showing she did, the Court must conclude that Plaintiff is mistaken.

Second, Plaintiff asserts that during the same October visit, he had a short conversation with Warren where she refused to give him Excedrin. Plaintiff alleges he told Warren that Tylenol was not working. *Id.* Plaintiff further alleges Warren replied that he could buy Ibuprofen from the store. *Id.* Plaintiff further alleges he then told Warren he could not use Ibuprofen due to kidney problems, and Warren "suggested … physical therapy." *Id.* Plaintiff further alleges that Warren then "refused to prescribe Excedrin that [he] had been requesting repeatedly." *Id.* Plaintiff further alleges Warren "was fully

aware … Tylenol did not work nor did [Plaintiff] have any Tylenol left." Even if this alleged conversation were credited, Plaintiff's specific claims are not supported by the record. Plaintiff's 2020 HNRs state only once in September that Plaintiff was "still getting headaches despite the Tylenol medical gave me." Tylenol does not work to prevent headaches, only to reduce their severity. Continuing to get headaches while using Tylenol does not on its own suggest that Tylenol is inadequate. In December, a medical record shows Plaintiff reported that Tylenol "sometimes … does not help." Without more detail, this statement also does not suggest that Tylenol is inadequate, only that it is sometimes inadequate. Plaintiff's December statement also shows that he still had access to Tylenol when he met Warren in October. Setting that to the side, Plaintiff identifies no part of the 2020 record where he specifically requested Excedrin and was denied. Plaintiff's HNRs, Informal Complaints, Grievances, and medical examination notes dated before his Second Amended Complaint do not refer to Excedrin. Even if Plaintiff had requested Excedrin, he provides no evidence that Excedrin is so much more effective than Tylenol that substituting Tylenol constitutes cruel and unusual punishment.[3]

Third, Plaintiff asserts that although EKGs were performed when he submitted HNRs alleging chest pain, they were not performed when he was having chest pains. Doc. 98 at 7–8. Plaintiff essentially confirms that the EKGs were normal but implies that they were not effective for evaluating intermittent chest pain. Plaintiff provides no evidence that EKGs are not an appropriate treatment for intermittent chest pain, or that Warren was deliberately indifferent by confirming the EKGs were normal. And Plaintiff provides no evidence from which the Court could infer that Warren or any other provider should have acted differently given Plaintiff's normal exam results.

Fourth, Plaintiff disputes that he has ever had allergies, or that anxiety could cause his symptoms. Although Plaintiff's medical record prior to transferring to Whetstone does not include an allergy assessment, it does include assessments of "cough," "wheezing,"

---

[3] Plaintiff even acknowledges that, after he received Excedrin in 2022, it "did not stop the migraine pain for long[.]" Doc. 98 at 16.

and "nasal congestion." *See, e.g.*, Doc. 93-10 at 128–130. Plaintiff's record also shows that he arrived at Whetstone with a prescription for Claritin, which is ordinarily used to treat allergies. *Id.* at 128. Finally, Plaintiff's "Nursing Diagnosis" of "Chest Pain [and] Allergies/headache" and "Allergic rhinitis [allergies]" on August 28 and September 8 are not attributed to Warren. Even permitting the inference that Plaintiff did not have allergies despite these aspects of his record, Plaintiff's dispute is not material because there is no record evidence suggesting that Warren's—or any other healthcare provider's—treatment was appropriate only for allergies. Instead, the record shows that Warren's treatment was based on Plaintiff's subjective symptoms and his medical exam. Plaintiff's dispute that anxiety could not cause his symptoms is unsupported by the record and similarly immaterial. Plaintiff's record shows that he was assessed with "Anxiety disorder" on December 29, 2016. *Id.* at 129. The Court infers from this that Plaintiff is familiar with some anxiety symptoms. But Plaintiff provides no evidence that anxiety symptoms do not include chest pain. Plaintiff also provides no evidence showing that his chest pain was not adequately treated by performing prompt EKGs and a physical exam.

### ii.   Spring 2021 Interactions Regarding Back Pain

In Spring 2021, Defendant Warren treated Plaintiff's HNR alleging low back pain and the need for Gabapentin to manage it. Plaintiff alleges he "was denied any pain medications" and told instead to "take physical therapy … which would only increase the pain." Doc. 98 at 17. Plaintiff further alleges he had previously been given exercises to help his back but they "had negative results." *Id.* Plaintiff does not address the fact that the day before he saw Warren, he submitted an HNR stating that "Tylenol and Ibuprofen is not helping." That statement implies Plaintiff had access to pain medication, however inadequate he considered it to be. In the same HNR, Plaintiff requested Gabapentin for his pain. Plaintiff does not provide evidence showing that Gabapentin was required for his back pain, or address Warren's affidavit where she explains that Gabapentin is "not ideal in the correctional setting [because it] can be diverted, misused, and abused by inmates due to [its] side effects and addictive qualities." Doc. 93-7 at 9. Plaintiff also

does not provide evidence showing that Warren's offer of an antidepressant also used to help pain was inadequate or contraindicated. As with his claims about Excedrin, Plaintiff fails to provide evidence that Gabapentin was required under the circumstances such that using Tylenol constituted cruel and unusual punishment.

### iii.    Spring 2021 Cancelled Records

Plaintiff alleges that the two HNRs marked "cancelled per inmate request" and signed by Warren were a "false claim by medical staff as there was never any such request, nor is [Defendants' assertion that the HNRs were cancelled at Plaintiff's request] supported by *any* signed refusal notice (per medical/ADCRR policy) by the plaintiff." Doc. 98 at 13 (emphasis in original). Plaintiff does not explain what a "signed refusal notice" is or provide the ACRR policy requiring it in these circumstances. The Court cannot find it in the policy documents submitted by Defendants. In any event, Plaintiff's dispute is not material because Defendants' liability does not depend on the HNRs. Even viewed as evidence that Warren improperly cancelled two HNRs, the Court cannot conclude that Plaintiff was prejudiced because he made nearly identical requests at his April 14 examination. Plaintiff also provides no evidence that he submitted any other HNRs after the two that were cancelled. Similarly, Plaintiff provides no evidence or even alleges that the cancelled HNRs are related to the second Formal Grievance Plaintiff signed on April 24, 2021, but never filed. The second Grievance could not support a claim against Warren because she was not the Facility Health Administrator, but even if it were related somehow to the HNRs Warren signed, Plaintiff does not allege that he was prevented from refiling his HNRs or Grievances.

None of Plaintiff's other allegations, medical records, HNRs, Informal Complaints, or Grievances refer to Warren or otherwise implicate her. Plaintiff has therefore failed to provide evidence demonstrating a genuine issue for trial, and summary judgment is warranted in favor of Warren.

### B.  Defendant Ferguson

Summary judgment for Defendant Ferguson is also warranted because she

promptly and adequately responded to Plaintiff's first Formal Grievance, and Plaintiff's overall care was not constitutionally inadequate. Plaintiff provides no evidence that Ferguson behaved indifferently. Instead, his evidence shows the opposite. Ferguson had one interaction with Plaintiff's record in October 2020, when Ferguson reviewed Plaintiff's first Formal Grievance. Plaintiff's Grievance stated his issues would not be resolved until he attended his scheduled provider appointment. Three days later, he attended that appointment and the provider, Warren, examined him and his medical records, ordered labs, assigned him to light duty for a year, confirmed he still had Tylenol, and advised him to submit HNRs for future needs. Ferguson reviewed Plaintiff's Grievance and record, noted that Plaintiff had seen the provider, and determined Plaintiff's Grievance was resolved. Ferguson was not the Facility Health Administrator when Plaintiff filed his second Formal Grievance. The Court found no evidence that Plaintiff submitted any other Formal Grievance while Ferguson was at ASPC-Tucson.

Plaintiff does not even allege that Ferguson's response to his first Grievance was inadequate. Instead, Plaintiff argues that Ferguson is responsible for inadequate staffing at ASPC-Tucson.[4] Doc. 98 at 6–7. Plaintiff seeks to support this allegation primarily by citing a portion of a district court order from another case where inadequate staffing was found at ASPC-Tucson. Doc. 98-1 at 2–7 (citing *Jenson, et al. v. Shinn, et al.*, 2:12-cv-00601-ROS Doc. 4335). Plaintiff is presumably a class member of that suit and may expect relief through it accordingly. But he fails to explain how *Jenson*'s legal conclusions or facts relate to his own case specifically. He alleges that Ferguson's inadequate staffing made requests to see a provider "of no avail." Doc. 98 at 8. But Plaintiff timely saw a provider who reviewed his history, conducted an exam, ordered labs, assigned him to light duty, and confirmed he had Tylenol for pain. Plaintiff's other HNRs similarly resulted in evaluation on the nursing line and, in Spring 2021, a full exam by a provider. Plaintiff also fails to explain how his suit is similar to *Jenson*. *Jenson*

---

[4] Plaintiff also alleges that Defendant Ferguson should have "blocked" his transfer to Whetstone due to a COVID-19 outbreak there. Doc. 98 at 4. This allegation is part of a theory of liability that did not survive the Court's Screening Order. *See* Doc. 100.

was a class-action lawsuit alleging constitutionally inadequate staffing. Plaintiff's Second Amended Complaint alleges deliberate indifference for failing to adequately respond to his HNRs. Even if Plaintiff had filed a class-action lawsuit, *Jenson* was filed in 2012 and tried in 2021. To the extent Plaintiff seeks to impose liability for the issues litigated in *Jenson*, his case is duplicative and therefore precluded. Plaintiff does not name Centurion as a defendant or allege that Centurion or Ferguson failed to comply with any aspect of *Jenson*'s orders. *Jenson* therefore cannot support Plaintiff's claim for deliberate indifference against Ferguson. Overall, the record does not support Plaintiff's assertion that he received inadequate treatment due to inadequate staffing because he was promptly seen after each HNR and treated consistently with his symptoms.

Plaintiff also argues that Ferguson was responsible for the "grossly inadequate qualifications of staff." Doc. 98 at 14. Throughout Plaintiff's HNRs and other records, he alleged the need to see a doctor, not a nurse. *See, e.g.*, Doc 98-1 at 19. In his Response, he alleges that his COVID symptoms "should have been addressed over a year earlier [than they were] by a virologist or specialist of virus infections and put on monoclona antibodies in order to reduce and relieve the COVID symptoms and health problems early on[.]" Doc. 98 at 14–15. Plaintiff also repeatedly complains that he was only seen on the nursing line and not referred to a provider. *See, e.g.*, Doc. 98 at 12. He alleges his visits to the nursing line resulted in his COVID symptoms continuing "to worsen … causing the plaintiff motor skill problems, and serious health problems[.]" *Id.* Plaintiff also alleges that by the time Ferguson's responded to his first Grievance he had "wasted 3 months, 3 absences from work, and received no adequate medical care." Doc. 98 at 11. Plaintiff concludes that Defendant Ferguson was responsible for these perceived lapses because she was "responsible for *all* staffing issues[.]" Doc. 98 at 14 (emphasis in original).

But Plaintiff does not provide evidence to support his allegations. Plaintiff provides no evidence showing that a virologist or specialist in virus infections is required to diagnose or treat COVID symptoms. Plaintiff does not define "monoclona antibodies" or provide evidence they were required. Plaintiff provides no evidence that a doctor or an

outside provider were required to treat his symptoms. He just insists they were. That is insufficient to defeat summary judgment, which turns on the record evidence. Even if Plaintiff could support his opinions, that still would not defeat summary judgment to the extent he merely identified a difference of opinion between medical providers, or a medical judgment not to prescribe a certain course of treatment.

Plaintiff also does not contend with the evidence presented in his medical record. For example, Plaintiff's August 2020 HNRs alleged headaches, congestion, lost sense of smell and taste, lightheadedness, dizziness, sick, nauseated, numbness in the left hand, sore throat, coughing, and feeling "about to have a heart attack." Plaintiff's December 2020 HNR alleged constant migraines, trouble thinking and concentrating, breathing problems, chest pains, and "all other symptoms remain." But Plaintiff's August examination showed mild to moderate pain (1/10 to 5/10), clear lungs, regular pulse, warm and dry skin, a non-tender abdomen, and a normal EKG. Doc. 93-10 at 6. Plaintiff's September examination showed lower reported pain (1/10 to 4/10), clear lungs, regular pulse, warm and dry skin, and non-tender abdomen. At Plaintiff's October examination he reported no fever/chills, no shortness of breath or cough, and no chest pain or palpitations. The October examination also showed no cough, no heart murmur, and a normal EKG, with some mild tenderness in the lower back. And Plaintiff's December examination showed "headache 5/10" but no chest pain, no signs of acute distress, and that Plaintiff "refused to see mental health[] to help with concentration." This contrast between Plaintiff's HNRs and his medical exam results continued in Spring 2021. The Court notes a similar contrast between Plaintiff's allegations that he was denied any pain medication and his repeated statements to medical staff that he either was using Tylenol or had access to Tylenol and Ibuprofen.

Aside from Plaintiff's personal opinion that his care was inadequate, Plaintiff does not explain how Ferguson's response to his first Formal Grievance or any other actions were deficient. The first Grievance stated Plaintiff needed to see a provider, and he had seen a provider by the time Ferguson reviewed his file. Plaintiff's HNRs were promptly

recorded, and he was routinely examined at the nursing line. The only apparent issue is that Plaintiff disagreed vehemently with the medical staff's assessment. That is not enough to hold a trial. The record evidence does not support a claim for Ferguson's deliberate indifference, and summary judgment in Ferguson's favor is warranted.

**C.  Unnamed Defendants and Claims Not Properly Before the Court**

Much of Plaintiff's response is directed not at Defendants, but at former defendants, non-parties, and theories severed by the Court's Screening Order. For example, Plaintiff alleges a cold and flu event at ASPC-Tucson was caused by housing inmates "in prison tents all winter with no heating, of which had been condemned and deemed to be unconstitutional and were in the process of being torn down [when] suddenly reopened as the result of security issues at ASPC-Lewis complex due to the need for level 2 minimum security housing, of which [Plaintiff] caught a cold and flu due to the lack of heating in tents over 20 years old with numerous gaping holes in every tent." Doc. 98 at 3–4. While Plaintiff's allegations are concerning, they do not refer to any part of the record or explain how they support a claim for deliberate indifference against Defendants Warren and Ferguson. Similarly, Plaintiff alleges that "inmates' complaints and COVID symptoms were dismissed since it was medical's priority to end the quarantine so that Whetstone staff did not have to pass out all meals, store property, medications, and mail multiple times throughout the day." Doc. 98 at 5. Plaintiff further alleges that "any inmate continuing to ask for medical treatment [related to COVID] were shipped off the yard and sent to the 'hole' being a place of disciplinary sanctions[.]" *Id.* Again, Plaintiff's allegations are not supported by the record and do not meaningfully refer to either Defendant. Similar claims against different defendants appeared in Plaintiff's original complaint, amended Complaint, and Second Amended Complaint, and were dismissed for failure to state a claim. *See* Docs. 1, 13, 16, 19, 21. Similarly, most of Plaintiff's administrative record does not mention Warren and Ferguson, and the medical staff mentioned are not named as defendants. As explained above, Plaintiff does not demonstrate that his care from unnamed medical staff was constitutionally inadequate

and attributable to Ferguson.

Other aspects of Plaintiff's Response refer to theories severed by the Court's Screening Order. For example, Plaintiff alleges that his initial transfer to Whetstone and exposure to COVID-19 violated the Constitution. Doc. 98 at 2–3. The Court addressed this theory in its Screening Order and dismissed it for failure to state a claim. *See* Doc. 21. The Court later confirmed the effect of its Screening Order and gave Plaintiff an opportunity to amend his Response, Doc. 100, which he declined. *See* Docs. 101, 102. These aspects of Plaintiff's Response also fail to identify a genuine issue for trial.

**D. Official Capacity and Punitive Damages**

**i.    Official Capacity**

Plaintiff is suing Defendants in their official capacity as well as a personal capacity. To establish his claims against their official capacities, Plaintiff must show a constitutional deprivation resulting from either Defendants' or their employer's policy, custom, or practice. *Monnell v. Dep't of Soc. Serv.*, 436 U.S. 658, 694 (1978). Plaintiff provides no evidence of a constitutional deprivation because his healthcare was generally responsive to his needs. Plaintiff also provides no evidence of a policy, custom, or practice that resulted in a constitutional deprivation. Summary judgment is therefore warranted for both Defendants in their official capacities.

**ii.    Punitive Damages**

Summary judgment is also warranted for both Defendants on Plaintiff's claim for punitive damages. Punitive damages are not available here because Plaintiff has failed to show entitlement to damages generally. Plaintiff's evidence shows that Defendants were at most negligent in certain aspects of his care, and never acted with the evil intent or reckless disregard required for punitive damages.

///

///

///

///

**V.      Order**

For the reasons above,

**IT IS ORDERED GRANTING** Defendants' Motion for Summary Judgment (Doc. 92). The Clerk of the Court shall enter judgment accordingly.

Dated this 3rd day of April, 2023.

Honorable John C. Hinderaker
United States District Judge